IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,　　§
　　　　　　　　　　　　　　　§
　　　　　　　　Plaintiff,　　§
　　　　　　　　　　　　　　　§　Civil Action No. 3:05-CV-2147-D
VS.　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　§
CORNERSTONE WEALTH　　　　　§
CORPORATION, INC., et al.,　§
　　　　　　　　　　　　　　　§
　　　　　　　　Defendants.　§

MEMORANDUM OPINION
AND ORDER

The court revisits this enforcement action under the Credit
Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j, to
determine whether defendants should be enjoined from engaging in
the business of a credit repair organization and should be
subjected to civil penalties under § 5(m)(1)(A) of the Federal
Trade Commission Act ("FTCA"), 15 U.S.C. § 45(m)(1)(A).

I

A

The court need only recite the facts relevant in deciding the
instant motion. A fuller account of the facts may be found in the
court's prior opinions in this case and in a predecessor case
involving these parties. *See United States v. Cornerstone Wealth
Corp.*, 2007 WL 2331033, at *1 (N.D. Tex. Aug. 16, 2007) (Fitzwater,
J.) ("*Cornerstone II*"), and *United States v. Cornerstone Wealth
Corp.*, 2006 WL 522124, at *1 (N.D. Tex. Mar. 3, 2006) (Fitzwater,
J.) ("*Cornerstone I*").

On behalf of the Federal Trade Commission ("FTC"), the United States of America ("the government") sued defendants Cornerstone Wealth Corporation, Inc. ("Cornerstone"), a credit repair company, and Cornerstone's President, John R. Atchley, Jr. ("Atchley"), in 1998 for violating CROA. That same year, Cornerstone and Atchley entered into a stipulated consent order for permanent injunction ("1998 Order"). The 1998 Order, *inter alia*, permanently enjoined Cornerstone and Atchley from "charging or receiving any money or other valuable consideration for the performance of any service which the Defendants have agreed to perform for the purpose of improving any consumer's credit record, credit history, or credit report before such service has been fully performed."[1] *Cornerstone I*, 2006 WL 522124, at *1. The 1998 Order also permanently enjoined Cornerstone and Atchley from violating any provision of CROA. *Id.*

In 2005 the government filed a motion to hold Cornerstone and Atchley in civil contempt for failing to comply with certain terms of the 1998 Order. Following an evidentiary hearing, the court held Cornerstone and Atchley in civil contempt ("2006 Order"). *Id.* at *5, *8. Specifically, in the 2006 Order the court held that defendants' practice of providing services before the expiration of a three-day rescission period violated § 15 U.S.C. § 1679d. *Id.* at

---

[1]This provision paraphrases 15 U.S.C. § 1679b(b): "No credit repair organization may charge any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

*2-*5. The court also held that, under the guise of a guarantee service plan, defendants had charged customers for services before the services were fully performed, in violation of § 1679b(b) and the express prohibition of the 1998 Order. *Id.* at *5-*8. Under the guarantee service plan, Cornerstone's customer service contract ("Service Contract") promised that, "for no additional charge to the Client, Cornerstone will re-verify your credit information until inaccurate or obsolete information is resolved on the credit report, for up to two years after the date of this Service Contract." *Id.* at *6. Despite Cornerstone's contractual promise to perform services for two years, it collected fees "the day a consumer sign[ed] the [Service Contract], within a few days thereafter, or partly within a short time frame after signing the [Service Contract] and in monthly installment payments, which [could] extend for a period of several months." *Id.* at *5. The court concluded that "[t]he 'guarantee' is nothing more than an artifice that enables Cornerstone to charge for services before they have been fully performed." *Id.* at *8. Based on the court's findings, it ordered that Cornerstone "immediately cease and desist from providing credit repair services to consumers until three business days have elapsed from the signing of the contract[.]" *Id.* at *10. The court also ordered that Cornerstone "immediately cease and desist charging or receiving any money or other valuable consideration from consumers for credit repair services that have

- 3 -

not been fully performed." *Id*. The court also imposed a $500 per day fine, beginning March 13, 2006, for each business day that Cornerstone failed to comply with certain requirements of the 2006 Order. *Id.*

B

In the instant, second lawsuit, the government seeks a permanent injunction against Cornerstone and Atchley and imposition of a civil penalty. The government moved for summary judgment in 2007 on its claim that defendants were still collecting payments from customers in advance of full performance, in violation of § 1679b(b), the 1998 Order, and the 2006 Order. The government also sought summary judgment on its claim that Cornerstone had made numerous untrue or misleading statements on behalf of consumers to credit reporting agencies, in violation of § 1679b(a)(1).

The court treated the government's motion as unopposed. *Cornerstone II*, 2007 WL 2331033, at *2-*3. It held that the government's evidence established beyond peradventure that Cornerstone had continued to collect payments from customers under the guarantee service plan, in direct violation of the 1998 Order, the 2006 Order, and § 1679b(b). *Id.* at *4. In fact, defendants admitted that they continued to collect monthly installments before full services were performed from customers who had agreed to the two-year guarantee plan before the court entered its 2006 Order. Defendants maintained that the 2006 Order did not cover advance

payments from customers who had contracted with Cornerstone before the 2006 Order was entered. The court rejected this argument, pointing out that defendants' position made no sense, because the 2006 Order clearly characterized all payments under the guarantee service plan that Cornerstone had received before the guarantee period expired as illegal payments under § 1679b(b). *Id.*

The court also held that Cornerstone's practice of accepting post-dated checks in its initial meeting with customers contravened § 1679b(b), and, in turn, the 1998 Order and the 2006 Order. *Id.* at *5-*6. Under the Uniform Commercial Code, such checks can be cashed before the date on the check and thus constitute "money or other valuable consideration" the day the check is received. *Id.* The court denied the government's summary judgment motion, however, based on its claim that Cornerstone's practice of accepting customers' credit card information constituted receiving "money or other valuable consideration" before services were fully performed. The court was unable to determine from the summary judgment record whether Cornerstone in fact required this credit card information to be provided or whether customers voluntarily provided it. *Id.* at *7.

Although the government's evidence appendix contained ample proof that Cornerstone had violated § 1679b(a)(1) by disputing accurate, non-obsolete credit information, the court denied summary judgment on this basis because the government had failed to plead

facts in its complaint that would have given defendants fair notice of this allegation. *Id.* at *7 n.11. The court left for a subsequent adjudication the proper relief to be imposed for the violations that the government had established in its summary judgment motion. *Id.* at *8.

C

Following the court's decision in *Cornerstone II*, the government filed the instant motion to strike the trial setting and to enter order for relief. The court granted the part of the government's motion that sought to vacate the trial setting. The government's motion to enter an order for relief is now ripe for decision.

In its motion for relief, the government first advances new arguments regarding why § 1679b(b) prohibits credit repair organizations such as Cornerstone from receiving customers' credit card information in an initial meeting, even if the customers provide it voluntarily. The government thus asks the court to grant summary judgment relief against defendants on this basis. The government also requests that, regardless of the court's decision on this issue, based on the findings of liability in *Cornerstone II*, the court permanently enjoin Cornerstone and Atchley from engaging in the business of credit repair, pursuant to 15 U.S.C. § 53(b), and impose upon Cornerstone and Atchley a civil penalty of at least $600,000, under 15 U.S.C. § 45(m)(1)(A).

Cornerstone and Atchley have not responded to the government's motion to enter order for relief, despite the fact that it was filed September 7, 2007.

## II

The court first considers the government's new arguments in support of the premise that, even if it cannot be determined that Cornerstone *requires* its customers to provide their credit card information before all services are performed, Cornerstone's practice of *accepting* credit card information up front violates § 1679b(b).

Although in *Cornerstone II* the court did not expressly address the arguments on which the government now relies, the court treats the government's request for relief as a motion to reconsider, because the court decided this issue in *Cornerstone II*. Having considered the government's additional arguments, the court remains unpersuaded that it has committed a manifest error of law or fact in denying the government's summary judgment motion with respect to Cornerstone's practice of receiving credit card information. *See, e.g., Kimberly-Clark Corp. v. Cont'l Cas. Co.*, 2006 WL 2468712, at *1 (N.D. Tex. Aug. 25, 2006) (Fitzwater, J.) (denying motion to reconsider because court's prior decision contained no manifest error of law or fact). The court therefore denies the government's

motion to reconsider.[2]

III

The court now considers the government's request for injunctive relief based on defendants' violations of CROA.

The government asks that the court permanently enjoin Cornerstone and Atchley from engaging in the business of credit repair under § 53(b). 15 U.S.C. § 53(b) (§ 13(b) of the FTCA) permits the FTC to obtain a permanent injunction against "any person, partnership, or corporation [who] is violating, or is about to violate, any provision of law enforced by the [FTC] [.]" 15 U.S.C. § 1679h(a) (§ 410(a) of CROA) commits to the FTC the authority to enforce the provisions of CROA. Thus if the court finds that Cornerstone and Atchley are violating, or are about to violate, any provision of CROA, it can permanently enjoin them from doing so.

In deciding whether to issue an injunction based on past violations of the law, the court should consider such non-exclusive factors as

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's

---

[2]The court need not address in detail the government's motion to reconsider because it has no bearing on whether the government is entitled to an order for relief. The court can deny the motion to reconsider and still grant, and it does below, the government's request for an order for relief.

> recognition of the wrongful nature of his
> conduct, and the likelihood that the
> defendant's occupation will present
> opportunities for future violations.

*SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978). "The critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Id.* at 1334.

In *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982), the Fifth Circuit held that § 13(b) of the FTCA permits courts to enjoin more than mere unlawful acts. *Id.* at 717-18. Based on cases that interpreted other analogous injunction provisions, the court concluded that "[t]hese cases make indisputably clear that a grant of jurisdiction such as that contained in Section 13(b) carries with it the authorization for the district court to exercise the full range of equitable remedies traditionally available to it." *Id.* at 718. "Section 13(b) contains no express limitations on the otherwise full powers of the district court to mold appropriate decrees under its traditional equitable jurisdiction, and we decline to tie the hands of the district court without such express limitation." *Id.* at 719. "Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and to mould each decree to the necessities of the particular case.'" *Id.* at 718 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

- 9 -

The court is aware of three cases in which district courts have permanently enjoined defendants from conducting businesses based on underlying FTCA violations. *See FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468, 470 (11th Cir. 1996) (affirming permanent injunction preventing defendants from engaging in telemarketing business, ordering defendants to pay $487,500 in consumer redress, and allowing FTC to monitor defendants' future business activities); *FTC v. Think Achievement Corp.*, 144 F.Supp.2d 1013, 1018, 1022 (N.D. Ill. 2000) (permanently enjoining defendants from engaging in telemarketing business, awarding consumer redress of $28,149,600, and giving FTC monitoring rights over defendants), *aff'd in part, rev'd in part*, 312 F.3d 259 (7th Cir. 2002); *FTC v. Gill*, 71 F.Supp.2d 1030, 1049-51 (C.D. Cal. 1999) (permanently enjoining defendants from engaging in business of credit repair services, ordering payment of equitable restitution in the amount of $1,335,912.14, and granting FTC significant power to monitor defendants' future activity), *aff'd*, 265 F.3d 944 (9th Cir. 2001). In all three cases, the court granted the permanent injunction in the context of the government's motion for summary judgment. *Gem Merchandising*, 87 F.3d at 468; *Think Achievement*, 144 F.Supp.2d at 1014-15; *Gill*, 71 F.Supp.2d at 1034.

Because it involved CROA violations, *Gill* is the most instructive case for purposes of the government's present motion. The FTC initiated a civil enforcement action against two

individuals engaged in credit repair business, alleging that they were violating various provisions of CROA. *Gill*, 71 F.Supp.2d at 1034. The defendants entered into a consent decree enjoining them from violating any part of CROA and, more specifically, enjoining them from "charging or receiving money for credit repair services before the services are fully performed, making statements to credit reporting agencies that defendants knew or had reason to believe were untrue or misleading, [and] making or using any untrue or misleading representation of their services[.]" *Id.* Because the FTC believed that the defendants were continuing to violate CROA and the consent decree, it moved for summary judgment, seeking an order requiring the defendants to pay consumer redress and permanently enjoining them from engaging in the credit repair business. *Id.* at 1034, 1047-48. Until the consent decree was entered, the defendants advertised their services in a way that misled customers to believe that the defendants could permanently remove negative credit information from credit reports, regardless how accurate or how old the information was. *Id.* at 1038-39. These representations were misleading and thus contravened CROA § 404(a)(3). *Id.* at 1044.

Based on several customer declarations, the court held that the government had met its summary judgment burden of establishing that the defendants had violated § 1679b(a)(1) by sending letters on behalf of their customers to credit reporting agencies in which

they falsely alleged that the information on the customers' credit reports was inaccurate. *Id.* at 1040-42.[3]  The defendants argued that they believed the letters were true because they did not specifically ask their customers what items were accurate and non-obsolete.  *Id.* at 1042.  The *Gill* court rejected this contention, pointing out that, under § 1679b(a)(1), the "defendants ha[d] a duty to exercise reasonable care in making representations to credit reporting agencies.  Defendants' admissions that they d[id] not ask about the accuracy of the reports violate[d] that duty, and as such violate[d] the law."  *Id.* at 1042-43 (citation omitted).

The defendants in *Gill* also accepted down payments from customers after an initial consultation, in violation of CROA § 404(b) and an express provision of the consent decree.  *Id.* at 1044-45.  The defendants admitted having received down payments from customers, and they advanced a groundless argument that CROA did not prohibit the practice.  *Id.* at 1044.

In deciding to issue an injunction based on past violations of the law and of the consent decree, the *Gill* court focused on the defendants' "pattern of misrepresentations which convinces this Court that violations of the CRO Act and of the FTC Act were systemic."  *Id.* at 1047.  The court also found a strong possibility of recurrence: "defendants have continuously ignored and violated

---

[3]The defendants sent some letters before the consent decree was entered and others afterward.  *Gill*, 71 F.Supp.2d at 1041 nn.13, 14, and 15.

both the CRO Act and the preliminary injunction in this case. As the evidence demonstrates, defendants continue to send the same false and misleading letters to [credit reporting agencies]. As such, there is a real likelihood of a recurring violation." *Id.* at 1047-48. Based on these findings, the *Gill* court permanently enjoined the defendants from conducting credit repair services, and it ordered them to pay $1,335,912.14 in equitable monetary relief. *Id.* at 1049-50 (citation omitted).

The Ninth Circuit affirmed. *FTC v. Gill*, 265 F.3d 944, 959 (9th Cir. 2001). Concerning the defendants' violation of § 1679b(a)(1), the court pointed out that "[d]efendants deliberately did not ask . . . whether a negative item on a consumer's credit report was accurate or complete." *Id.* at 952. In addition to holding that the defendants had violated CROA § 404(b) by accepting down payments from customers, the court also concluded that "Defendants billed [customers] on a regular basis, regardless of whether the services had been completed." *Id.* at 952. "Even after stipulating to the preliminary injunctions, Defendants continued to collect money from clients who had retained them before the complaint was filed." *Id.* at 953. The court focused on other troubling aspects of the defendants' business practices:

> Defendants' credit repair services consisted
> almost exclusively of inundating the credit
> reporting agencies with dispute letters, sent
> in the *consumer's* name, which falsely alleged
> that various items on the credit report were
> incorrect or that a particular account did not
> belong to the consumer.  Consumers did not
> review or approve any of these letters and
> have stated that they did not authorize
> Defendants to provide false information to the
> [credit reporting agencies].

*Id.* at 952.  One defendant argued that "the district court abused its discretion in prohibiting him from engaging in the credit repair business and that some lesser restriction would have sufficed in these circumstances."  *Id.* at 957.  But the circuit court concluded that the defendant "offer[ed] no reason why he should be able to continue offering credit repair services."  *Id.* "[The defendant] had his chance.  Although he now claims that the less-restrictive terms of the district court's preliminary injunction should be the terms of the permanent injunction, his violation of those terms undermines the credibility of his argument."  *Id.*  The court therefore concluded that it found "no basis for disturbing the district court's prudent assessment that giving Defendants another chance might prove to be unwise."  *Id.*

IV

Having drawn appropriate guidance from *Gill*, this court now considers whether it should enjoin defendants based on their past violations of CROA, the 1998 Order, and the 2006 Order.

In addition to broadly enjoining violations of CROA, the 1998

Order specifically prohibited Cornerstone and Atchley from "charging or receiving any money or other valuable consideration for the performance of any service which the Defendants have agreed to perform for the purpose of improving any consumer's credit record, credit history, or credit report before such service has been fully performed." *Cornerstone I*, 2006 WL 522124, at *1. Despite this clear prohibition, defendants continued to collect fees in advance of full performance, under the guise of a guarantee plan, and were held in contempt of the 1998 Order for doing so. *Id*. at *8. Even after the court held that the guarantee plan violated § 1679b(b) and was prohibited by the 1998 Order, and ordered that Cornerstone and Atchley "immediately cease and desist charging or receiving any money or other valuable consideration from consumers for credit repair services that have not been fully performed," *id.* at *10, they continued to receive payments under the guarantee plan. Although, for customers retained after *Cornerstone I*, Cornerstone and Atchley ceased collecting payments under the guarantee plan in advance of full performance, there is no reasonable basis for their position that the 2006 Order covered only future customers. The court clearly identified this practice as illegal, and Cornerstone and Atchley persisted in it.

The government has introduced uncontested evidence that, between April 2006 and November 2006, at least 138 Cornerstone customers made payments under the guarantee plan in advance of full

performance of services. In a November 16, 2006 letter, defendants admitted that their current practice was to continue receiving installments under the guarantee plan for customers retained before the court issued *Cornerstone I*. In an April 16, 2007 deposition, Atchley admitted that Cornerstone had continued to receive payments under the guarantee plan, and that it would continue to do so as late as February 2008 (when the last two-year pre-*Cornerstone I* contract expires). Cornerstone and Atchley therefore continued to collect payments under the guarantee plan for at least one year after the court entered the 2006 Order. Every one of these payments contravened § 1679b(b), an express provision of the 1998 Order, and the specific prohibition contained in the 2006 Order. The violations that Cornerstone and Atchley committed of the 1998 Order and the 2006 Order were egregious, recurrent, and done with full knowledge. Their violations of this court's orders, and their admitted belief that they could lawfully continue to accept payments under the guarantee plan from pre-*Cornerstone I* customers, demonstrate that they do not recognize the wrongfulness of their actions and undermine any assurance that they might give the court that they will abstain from future violations of CROA or this court's orders.

Bolstering these conclusions, the government has submitted uncontested evidence that, between March 13 and December 1, 2006, Cornerstone and Atchley collected at least 33 post-dated checks

- 16 -

before rendering full performance, in violation of § 1679b(b), the 1998 Order, and the 2006 Order.  Although defendants' awareness of the illegality of the practice of accepting post-dated checks is not as clear as is their awareness that it was illegal to continue collecting payments under the guarantee plan, the government has also offered unrefuted proof from three Cornerstone customers establishing that, even after *Cornerstone I* was decided, defendants accepted present-dated checks in the initial customer meeting. Cornerstone and Atchley must have known that accepting a present-dated check is "money or other valuable consideration," and they were therefore fully aware that these three payments violated § 1679b(b), an express provision of the 1998 Order, and the 2006 Order.

At least until the court decided *Cornerstone I*, it was defendants' regular practice to provide services to customers before the three-day rescission period had expired, in violation of § 1679d.  The 1998 Order also prohibited this practice, and the court specifically held Cornerstone and Atchley in contempt of the 1998 Order for failing to honor their customers' right to rescind.

The court therefore concludes that a permanent injunction based on defendants' past violations is justified and fully supported by the record.

V

The court now considers the nature of the permanent injunctive relief that is appropriate to do equity and to mold the decree to the necessities of this case.

The misconduct of Cornerstone and Atchley is more serious than that of the *Gill* defendants. Many of the CROA violations established in *Gill* occurred before the defendants entered into a consent decree.[4] By contrast, in the present case, the government has focused solely on unlawful conduct taken after the 1998 Order. Certainly, conduct that is both illegal and specifically prohibited by an injunction is more culpable than illegal acts alone. Moreover, although the *Gill* defendants disobeyed CROA and a consent injunction, Cornerstone and Atchley have disobeyed CROA, the 1998 Order (to which they agreed), and this court's 2006 Order, which found them in civil contempt and ordered that they cease and desist the illegal practices identified and spelled out in detail in *Cornerstone I*. The court finds that the post-*Cornerstone I* violations committed by Cornerstone and Atchley are particularly egregious. And although Cornerstone and Atchley have partially complied with the 2006 Order by not collecting payments in advance of full performance under the guarantee plan for customers after

_____

[4]In *Gill* all the defendants' untrue statements in advertising, some of the letters to credit reporting agencies challenging accurate, non-obsolete information, and some of their receipts of payment in advance of performing services occurred before the consent decree.

*Cornerstone I*, the *Gill* defendants took a similar tactic. *See Gill*, 265 F.3d at 953.

The court recognizes that, in *Gill*, the government carried its summary judgment burden of establishing untrue or misleading statements that violated § 1679b(a)(1) and (3), while it did not prove similar violations in this case. But when this court denied the government's summary judgment motion as to defendants' violations of § 1679b(a)(1), it did not do so based on a deficiency of evidence supporting the government's allegations, it did so because of a defect in the pleadings. *Cornerstone II*, 2007 WL 2331033, at *7 n.11. In fact, considering that many of the letters relied on in *Gill* were written before the defendants entered into the consent decree, the government's evidence concerning § 1679b(a)(1) violations in the instant case is just as strong as that adduced in *Gill*.[5]

---

[5]The government has submitted declarations of four Cornerstone customers who affirm that the letters Cornerstone sent to credit reporting agencies on their behalf challenged accurate, non-obsolete credit information. P. App. 125–26, 131, 142–43, 150–55, 157–58, 164, 169–70, and 175–179. Cornerstone sent all these letters containing false statements after the court filed its 2006 Order. All four declarations demonstrate that Cornerstone either did not exercise reasonable care in inquiring into the accuracy of the disputed items or it knew that the items were accurate, but it disputed them anyway. The government has also pointed to testimony taken in support of the motion for civil contempt, in which various customers testified that Cornerstone did not ask them about the accuracy of their credit information before challenging it. *Id*. at 240, 254–55, and 262. Defendants have not refuted any of this evidence of violations of § 1679b(a)(1).
Moreover, as in *Gill*, Cornerstone's practice for the past 20 years, when sending letters challenging the accuracy of credit

Defendants' violations of CROA, the 1998 Order, and the 2006 Order have been systemic. The court finds that there is a strong possibility of recurrence. Defendants have continually disregarded the court's orders enjoining illegal acts under CROA. The court is persuaded that merely entering still another injunction against Cornerstone and Atchley that prevents them from engaging in illegal acts will not be sufficient to cause them to comply with CROA. Cornerstone and Atchley have had ample opportunity to operate under less restrictive alternatives, beginning in 1998. *See Gill*, 265 F.3d at 957. Nearly ten years after the FTC first sought relief against them for violating CROA, their opportunity to show that they can comply with the law has come to an end. The court therefore grants the government's request to enjoin Cornerstone and Atchley permanently from acting as a "credit repair organization," as that term is defined under CROA. *See* 15 U.S.C. § 1679a(3)(A).

---

reports, was to make it appear that the customers drafted the letters. P. App. 106-07. These letters bear no mark of Cornerstone's assistance, and Cornerstone signs them in a manner that makes it appear that the customers signed them. *Id.* at 100 and 106. To make the letters seem more authentic, Cornerstone intentionally leaves grammatical mistakes in the letters and mails them from different parts of the city, in envelopes filled out by the customers. *Id.* at 101 and 04-05. Cornerstone does not explain to its customers that such letters are being sent on their behalf. *Id.* at 100, 126, 143, 158, and 170.

The court considers next the government's request for a civil penalty under 15 U.S.C. § 45(m)(1)(A).

A

15 U.S.C. § 45(m)(1)(A) (FTCA § 5(m)(1)(A)) permits the FTC to

> commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this chapter respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.

CROA § 410 provides that "any violation of any requirement or prohibition imposed under this subchapter with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the [FTCA]." 15 U.S.C. § 1679h(b)(1). The same provision empowers the FTC "to enforce the provisions of [CROA] in the same manner as if the violation had been a violation of any [FTC] trade regulation rule[.]" 15 U.S.C. § 1679h(b)(2). Thus a knowing violation of CROA is subject to a civil penalty under § 5(m)(1)(A).

The FTCA sets the maximum penalty at $11,000 for each violation, or in the case of continual violations of the law, $11,000 for each day that the person or company fails to comply with the law. *See* 15 U.S.C. § 45(m)(1)(A), (1)(C); 16 C.F.R. § 1.98(d) (2007) (raising maximum penalty to $11,000).

The government has established that, from April 2006 until April 2007, defendants continued to receive payments in advance of full performance under guarantee service contracts consummated before *Cornerstone I*. *See supra* § IV. In *Cornerstone II* the court held that this practice violated § 1679b(b) and that defendants' arguments for its legality made no sense. *Cornerstone II*, 2007 WL 2331033, at *4. But before this conduct can serve as the basis for imposing a civil penalty under § 5(m)(1)(A), the government must prove that the violations were committed knowingly or with knowledge fairly implied based on objective circumstances.

Because the 2006 Order plainly characterized as illegal all payments received under the two-year guarantee plan in advance of full performance, the court holds that the violations of § 1679b(b) committed by Cornerstone and Atchley from April 2006 to April 2007 were committed with knowledge, or knowledge fairly implied on the basis of objective circumstances. The court is therefore authorized to impose a maximum penalty of $4,015,000 for defendants' continual violations of § 1679b(b) for one year. The government requests that the court impose a civil penalty of at least $600,000.

B

"In determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue

- 22 -

doing business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C). The court now considers each factor in determining the proper civil penalty.

1

The degree of defendants' culpability is high. The 2006 Order clearly identified defendants' practice of accepting payments under the guarantee plan in advance of full performance as violating § 1679b(b). *Cornerstone I* allowed no room for defendants' position that the 2006 Order applied only to customers whom Cornerstone retained after the date of the order. Moreover, the 1998 Order specifically enjoined Cornerstone and Atchley from accepting payments from customers in advance of full performance. This factor supports imposition of a large civil penalty.

2

As the court has explained above, defendants have a long history of violating CROA, including provisions other than § 1679b(b). Thus this factor also supports imposing a large civil penalty.

3

The court has an incomplete view of defendants' ability to pay a civil penalty. The government did submit uncontested evidence that, from March 13, 2006 until December 1, 2006, 285 new costumers signed contracts with Cornerstone, and that the average fee charged on each contract was $959.93. Extrapolating these numbers for a

period of one year yields a gross income of about $345,574.80. In his April 16, 2007 deposition, Atchley testified that business had been as usual since December 2006. But the court does not know, for example, whether Cornerstone's revenue exceeds its operating costs. Moreover, the court's only indication of Atchley's ability to pay is his uncorroborated statement that he grosses about $48,000 from his salary and that there is about $35,000 of equity in his home. While the government contends that defendants have refused to fill out financial disclosure forms, it has failed to point to evidence in the summary judgment record that establishes defendants' refusal to complete the forms.

So far as this court is aware, no court has as yet decided whether the government has the burden of proof on the "ability to pay" factor under 15 U.S.C. § 45(m)(1)(C). But the Fifth Circuit's analysis of similar statutory provisions persuades the court that the burden of proof is on the government.

In *Dazzio v. FDIC*, 970 F.2d 71 (5th Cir. 1992), the government assessed a civil penalty against an individual defendant under a provision of the Federal Deposit Insurance Act that required the Federal Deposit Insurance Commission ("FDIC"), in determining the proper amount of the penalty, to consider among other factors the "size of [the defendant's] financial resources." *Id.* at 73. The Board of Directors of the FDIC concluded that the defendant had the burden of providing evidence of his financial condition and that,

because he had failed to discharge that burden, it was proper to presume that he could pay a substantial penalty. *Id.* at 76. The Fifth Circuit reversed, concluding that it was error for the FDIC Board to assess a civil penalty under the standard it articulated. *Id*. 77-78, 82. Following the lead of the Second Circuit, which had interpreted another civil penalty provision that enumerated "ability to pay" as one factor to consider in determining the proper amount, the Fifth Circuit held that the government had the burden of "going forward with evidence on all the statutory factors-including ability to pay." *Id.* at 77. "'If Congress had intended a different result than placing the burden of proof on the proponent when a defendant's lack of resources is an issue, it could have written inability to pay a fine into the statute as an affirmative defense and shifted the burden of going forward with the evidence onto the defendant. Congress did not do that.'" *Id.* (quoting *Merritt v. United States*, 960 F.2d 15, 18 (2d Cir. 1992) (brackets omitted)).

Although the government has the burden of producing evidence of defendants' ability to pay, the few cases that have interpreted § 45(m)(1)(C) indicate that ability to pay is a non-dispositive factor. In *United States v. National Financial Services, Inc.*, 98 F.3d 131 (4th Cir. 1996), three defendants (a corporation and the company's president and chief lawyer) challenged the assessment of a $550,000 civil penalty under § 45(m)(1)(A) as an abuse of

discretion, but the Fourth Circuit affirmed. *Id.* at 140-41. The Fourth Circuit identified "ability to pay" as a proper factor in the assessment equation, but it did not even mention anything related to the defendants' ability to pay in reviewing the district court's analysis. *Id.* at 140-41.

In another case, the Eleventh Circuit affirmed a district court's assessment of a $5,455,280 penalty under § 45(m)(1)(A) against an individual who challenged the penalty as an abuse of discretion. *United States v. Prochnow*, ___ Fed. Appx. ___, 2007 WL 3082139, at *3-*4 (11th Cir. Oct. 22, 2007) (per curiam). Because the district court imposed a penalty considerably less than the maximum, the court did not review the district court's analysis of the § 45(m)(1)(A) factors in detail: "The court could have omitted much of the calculation from its analysis and reached the same, or even a higher, civil penalty assessment based on more general estimations and approximations." *Id.* at *4.

In another case in which an individual faced a maximum civil penalty of $616,000, the defendant argued that he had no ability to pay a fine because he was currently in bankruptcy. *United States v. Lasseter*, 2005 WL 1638735, at *5-*6 (M.D. Tenn. June 30, 2005). After considering all the factors, including the defendant's status as a bankrupt, the district court decided to impose a $56,000 civil penalty ($1,000 for each violation). *Id.* at *6.

These cases convince the court that "ability to pay" is not a

determinative factor in assessing a § 45(m)(1)(A) civil penalty.
The government has produced some, albeit incomplete, evidence of
defendants' ability to pay a civil penalty.  Although the evidence
presented pushes the civil penalty away from the maximum amount, it
does not prevent the court from imposing a significant penalty, if
the other factors so warrant.

4

Normally, the effect of the civil penalty on a defendant's
ability to do business would factor into the assessment equation.
But in this case, the court has already decided that equity demands
that defendants be permanently barred from engaging in the business
of a credit repair organization.  Consequently, this factor has no
bearing on the court's assessment of the proper amount of the civil
penalty.

5

Another factor that "justice may require" is that in the 2006
Order the court notified Cornerstone and Atchley that, following a
grace period, they would face a $500 fine for each business day of
non-compliance with certain requirements of the order.  *Cornerstone
I*, 2006 WL 522124, at *10.  This fine was to be imposed without
regard to defendants' ability to pay.  The court therefore
concludes that the § 45(m)(1)(A) penalty should be at least $500 a
day.  Having considered all of the factors *in toto*, including the
number and nature of defendants' violations and the fact that a

$500 per day penalty has not deterred defendants, the court holds that the proper civil penalty is treble that amount, i.e., $1,500 for each day of non-compliance, multiplied by 365 days, which equals $547,500.

*     *     *

Accordingly, for the reasons stated, the court grants the government's September 7, 2007 motion to enter order for relief. By judgment filed today, the court grants relief as set forth in this memorandum opinion and order.

**SO ORDERED.**

January 24, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE