IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § <br> § <br> Plaintiff, § <br> § Civil Action No. 3:05-CV-2147-D <br> VS. § <br> § <br> CORNERSTONE WEALTH § <br> CORPORATION, INC., et al., § <br> § <br> Defendants. § | |

MEMORANDUM OPINION
AND ORDER

Defendants Cornerstone Wealth Corporation, Inc. ("Cornerstone") and John R. Atchley, Jr. ("Atchley") have filed an emergency motion to stay permanent injunction pending appeal. For the reasons that follow, the court denies the motion.[1]

I

In March 2006 the court held defendants in civil contempt for violating various portions of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j, that were prohibited by a 1998 stipulated consent order for permanent injunction ("1998 Order"). *United States v. Cornerstone Wealth Corp.*, 2006 WL 522124, at *5, *8 (N.D. Tex. Mar. 3, 2006) (Fitzwater, J.) ("*Cornerstone I*"). Defendants had entered into the 1998 Order with the United States of America ("the government") on behalf of the Federal Trade

---

[1] The court is deciding this motion at defendants' request on an emergency basis. Although the court has attempted to set out its essential reasoning, this memorandum opinion is necessarily confined to the explanation that can be given in the context of an expedited ruling.

Commission ("FTC"). In a separate lawsuit—the instant case—brought by the government against defendants, the government alleged further violations of CROA. The court largely granted the government's motion for summary judgment in *United States v. Cornerstone Wealth Corp.*, 2007 WL 2331033, at *1 (N.D. Tex. Aug. 16, 2007) (Fitzwater, J.) ("*Cornerstone II*"). And in a memorandum opinion and judgment filed January 24, 2008, the court granted final relief in favor of the government. *United States v. Cornerstone Wealth Corp.*, 2008 U.S. Dist. LEXIS 5540, at *25, *35 (N.D. Tex. Jan. 24, 2008) (Fitzwater, C.J.) ("*Cornerstone III*"). The judgment, in relevant part, includes a provision that permanently enjoins defendants "from directly or indirectly owning, operating, engaging in the business of, functioning as, providing the services of, or being employed by a 'credit repair organization,' as that term is defined in 15 U.S.C. § 1679a(3)(A)." Judgment § I. The judgment also imposes a civil penalty against defendants in the sum of $547,500, under 15 U.S.C. § 45(m)(1)(A). Judgment § VI. On February 1, 2008 defendants filed the instant emergency motion to stay permanent injunction pending appeal.

II

To decide whether a stay pending appeal should be granted, the court must consider the following criteria:

>   (1) Whether the movant has made a showing of likelihood of success on the merits;
>   (2) Whether the movant has made a showing of irreparable injury if the stay is not granted;
>   (3) Whether the granting of the stay would substantially harm the other parties; and
>   (4) Whether the granting of the stay would serve the public interest.

*In re First S. Sav. Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987) (citing *Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982)). Because the court holds that defendants have not made the required showing of a likelihood of success on the merits, and because without such a showing they are not entitled to a stay, the court denies their emergency motion to stay permanent injunction pending appeal.[2]

## III

### A

Defendants contend that they will be successful on appeal on two issues. First, they posit that the court erred in *Cornerstone II* and *Cornerstone III* by holding that their practice of accepting

---

[2] Because defendants cannot satisfy the first element, the court need not analyze the remaining three. *Cf. Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003) (addressing four-factor preliminary injunction test and holding that "[a]s alone, the absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law, we need not address the three remaining prongs of the test for granting preliminary injunctions."); *see also Ponce v. Socorro Indep. Sch. Dist.*, 508 F3d 765, 768 (5th Cir. 2007) (holding on basis of first factor alone that it was error for district court to issue preliminary injunction) ("[o]ur analysis begins—and ends—with the first requirement.").

payments under a "guarantee" contract violated 15 U.S.C. § 1679b(b). Second, defendants maintain that the court incorrectly held in *Cornerstone II* and *Cornerstone III* that their practice of accepting postdated checks in advance of full performance violated 15 U.S.C. § 1679b(b).

B

In *Cornerstone I* the court held defendants in contempt of the 1998 Order for, *inter alia*, accepting payments from customers pursuant to a "guarantee" contract under which Cornerstone promised to re-verify its customers' credit information until inaccurate or obsolete information was resolved, for up to two years. *Cornerstone I*, 2006 WL 522124, at *5-*8. The court concluded that defendants' acceptance of payments before the end of the "guarantee" period constituted accepting payments in advance of full performance, which was prohibited under 15 U.S.C. § 1679b(b) and the 1998 Order. *Id*. After the court clearly characterized the receipt of payments under the "guarantee" contract as "an artifice that enables Cornerstone to charge for services before they have been fully performed," the court ordered that Cornerstone "immediately cease and desist charging or receiving any money or other valuable consideration from consumers for credit repair services that have not been fully performed." *Id*. at *8, *10.

In *Cornerstone II* the court held that the government had established beyond peradventure that defendants had continued to

collect payments in advance of full performance under the "guarantee" contract for customers retained before *Cornerstone I*, in violation of § 1679b(b), the 1998 Order, and *Cornerstone I*. *Cornerstone II*, 2007 WL 2331033, at *3-*4. Because Cornerstone failed to respond to the government's summary judgment motion, the court decided the motion under the standards that apply when no response is filed. *Id.* at *2-*3. Similarly, defendants failed to respond to the government's motion that the court decided in *Cornerstone III*. *Cornerstone III*, 2008 U.S. Dist. LEXIS 5540, at *8.

In their emergency stay motion, defendants acknowledge that they continued to accept payments from customers who had signed a "guarantee" contract before *Cornerstone I*, but they maintain that the "guarantee" for these customers had expired under the contracts' "acceleration/termination clause" and that all payments received from these customers were accepted after all services were performed.

Defendants' argument is not supported by the record.[3] After *Cornerstone I*, defendants sent a November 16, 2006 compliance

---

[3]Defendants' conduct in the almost ten-year history of this dispute—including some of the arguments they have advanced—gives force to the concerns that prompted Congress to regulate credit repair agencies. For example, they have engaged in at least one artifice to circumvent the clear intent of CROA, and they have given this court's orders unreasonable readings when necessary to continue conduct that they prefer to engage in, despite its illegality under CROA.

report to the government in which they admitted that they had continued to accept payments under the "guarantee" contracts as to customers retained before *Cornerstone I*:

> Additionally, Cornerstone still accepts and requests payments from customers who contracted with Cornerstone prior to March 3, 2006 because it is Cornerstone's belief that the Court's March, 3, 2006 Order, just like the original Court order in this matter and the original settlement agreement entered into by and between Cornerstone and the Government, does not address the acceptance or requesting of payments from customers who contracted prior to the date thereof.

P. Mot. Summ. J. App. 58. Defendants' admission says nothing to indicate that these "guarantee" contracts—under which defendants continued to accept payments—were terminated or expired.

Similarly, in an April 16, 2007 deposition, Atchley admitted without qualification that Cornerstone continued to accept payments under the "guarantee" contracts entered into before *Cornerstone I*:

> Q. Now, in response to-here on the compliance report it states that as to customers who had contracts already in effect on March 3, 2006 Cornerstone continued to charge and receive monthly payments from those customers, correct?
> A. Yes.
> Q. So that's accurate?
> A. Yes.
> Q. These would be customers who signed the old contract that the Court ordered you to change, right?
> A. Yes.
> Q. And these pre-March 2006 customers had the two-year guarantee in their contract, right?
> A. Can you repeat the question?
> Q. These customers that I'm referring to from before March of 2006 had the two-year

>           guarantee in their contracts, right?
>           A.   Yes.
>           Q.   So some customers signed the contract with
>           the two-year guarantee as recently as February
>           of 2006, correct?
>           A.   Yes.
>           Q.   So some-some customers who signed the old
>           contract with the two-year guarantee are
>           currently making monthly payments to
>           Cornerstone, correct?
>           A.   Yes.

P. Mot. Summ. J. App. 67-68. Not only did Atchley fail to point out that these "guarantee" contracts had expired, his admission that pre-March 2006 customers would continue to make monthly payments is completely inconsistent with defendants' current position in the emergency stay motion that the "guarantee" contracts of pre-March 2006 customers from whom Cornerstone accepted payments had expired under an acceleration or termination clause. If these customers' "guarantee" contracts had expired, it would make little sense that they would continue making monthly installments to defendants.

Moreover, defendants' current position is not supported by any record evidence. Although defendants assert that they can prove the validity of their new argument, they should have done this in response to the government's summary judgment motion and its subsquent motion for an order of relief. Defendants had *two* opportunities to advance the arguments they now present in this emergency stay motion, but they failed to file timely responses to either government motion. The court therefore correctly held in

*Cornerstone II* and *Cornerstone III* that defendants continued to accept payments under "guarantee" contracts that the court had previously characterized as illegal. Defendants have therefore failed to show that they are likely to succeed on the merits of an appeal that challenges this holding.

C

Defendants also maintain that they will successfully appeal the court's holding in *Cornerstone II* that Cornerstone's practice of accepting postdated checks in an initial meeting with customers is receiving "money or other valuable consideration" before all services are fully performed, in violation of 15 U.S.C. § 1679b(b). Defendants posit that the court's reliance on Tex. Bus. & Com. Code Ann. § 4.401(c) (Vernon 2002) is misplaced.

Section 4.401(c) provides: "A bank may charge against the account of a customer a check that is otherwise properly payable from the account, *even though payment was made before the date of the check*, unless the customer has given notice to the bank of the postdating describing the check with reasonable certainty." § 4.401(c) (emphasis added). Defendants argue that § 4.401(c) addresses only the issue of when a bank may charge a customer's account without incurring liability. They cite Tex. Bus. & Com. Code Ann. § 3.113 as support for their position that a postdated check is not payment until the date on the check. Section 3.113 states, in relevant part: "An instrument may be antedated or

postdated. The date stated determines the time of payment if the instrument is payable at a fixed period after date. Except as provided in Section 4.401(c), an instrument payable on demand is not payable before the date of the instrument." Although § 3.113 says that an instrument is not payable before the date of the instrument, it expressly excepts instruments charged on a customer's account under § 4.401(c), which permits banks to honor postdated checks before the date on the check.

Defendants also contend that a payee on a postdated check incurs liability if it presents the check to the drawee bank before the date on the check, but they provide no legal authority for this position. Although a payee on a postdated check may not have a claim against the payor if the drawee bank fails to honor the check when presented before the date on the check, the acceptance of postdated checks is still accepting "money or other valuable consideration," because the drawee bank is legally permitted to honor the postdated check.

But even assuming *arguendo* that a postdated check is not payable until the date on the check, credit repair organizations that accept postdated checks in an initial meeting with customers still receive "money or other valuable consideration" in advance of full performance of services. The purpose of CROA is "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2).

In enacting CROA, Congress sought to prevent credit repair organizations from cheating their customers out of money by forcing them to pay for worthless services after being misled by the credit repair organization's representations concerning those services. *See FTC v. Gill*, 71 F.Supp.2d 1030, 1040 n.11 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001). Section 1679b(b) serves this goal by prohibiting credit repair organizations from accepting "money or other valuable consideration" until all their services are fully performed. If a credit repair organization accepts a postdated check in an initial meeting and then renders a worthless service before the date on the check, the customer is at risk of being forced to pay for the worthless service. This is because the credit repair organization can present the check to the drawee bank for payment before the date of the check, depriving the customer of the opportunity to request that the payment be returned. Thus credit repair organizations that accept postdated checks in advance of full performance, and then deposit the checks before the dates the customer has written on them, will be paid regardless whether their services fulfilled the representations made to their customers. This is plainly inconsistent with the intentions of CROA. The court therefore concludes that defendants have failed to show that they are likely to obtain reversal on appeal of the

court's holding concerning postdated checks.[4]

\* \* \*

Accordingly, defendants' February 1, 2008 emergency motion to stay permanent injunction pending appeal is denied.

**SO ORDERED.**

February 5, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[4]Although the court's decision to issue a permanent injunction did rely in part upon defendants' practice of accepting postdated checks, this particular violation of CROA was not a critical factor in its reasoning. *Cornerstone III*, 2008 U.S. Dist. LEXIS 5540, at *17-*25. Thus even assuming that defendants are correct that accepting postdated checks in an initial meeting does not constitute reception of "money or other valuable consideration" in advance of full performance, the court, for other reasons, properly granted the government's request for a permanent injunction.